13907

PORT UTILITIES COMMISSION OF CHARLESTON v. MARINE OIL CO.

(175 S. E., 818)

*Messrs. J. C. Long* and *M. L. McCrae,* for appellant,

*Mr. Lionel K. Legge,* for respondent,

September 19, 1934.

The opinion of the Court was delivered by MR. W. C. COTHRAN, ACTING ASSOCIATE JUSTICE.

It appears that the little word "slip" has various and sundry meanings. In a case now pending in this Court, "slip" is used to designate a piece of paper upon which there was written a report by a doctor for a health claim against an insurance company. In this case "slip" is used to designate open water adjoining a warf. We have not yet encountered it as a "slip of the tongue," although it has been met in a slip on a banana peel, nor have we had occasion to refer to it as used to describe a very important article of feminine apparel.

The proceeding now before us is one in ejectment; the oil company having been ordered to vacate certain premises for failure to pay the rental alleged to be due. The statute under which the proceeding was brought is Section 8813 of the Code, and it provides for the ejectment of tenants for nonpayment of rent.

A warrant of ejectment was duly issued, testimony was taken, and a decree rendered for the Utilities Commission requiring the oil company to vacate. Bond was given by the oil company, and this appeal was taken. The specifications of error will be fully treated in this opinion without setting them forth in detail.

At Charleston there was constructed many years ago Adger's Wharf. It was in two portions, and known as North Adger's Wharf and South Adger's Wharf. The open water between the north wharf and the south wharf was known as a slip. The south wharf was some one hundred feet from the shore line and the water between the south wharf and the shore line was also known as a slip. In this case the slips were open water where boats were permitted to enter and

depart for the purpose of loading and unloading. In the slip between the south wharf and the shore line there was an old abandoned boat or hulk which prevented the free and uninterrupted use of that slip. More will be said later as to this old sunken boat. The oil company and the utilities commission entered into a rental agreement whereby for a valuable consideration the oil company leased the property known as North Adger's Wharf, South Adger's Wharf, and the aforesaid slips; the contract containing the following clauses:

"Third: The lessee further agrees to pay to the lessor on or before the 15th day of February, A. D., 1929, the sum of Five Hundred Dollars ($500.00) to be used by the said lessor towards the cost of removing the old hull now sunk at dock on said premises, or of clearing the said dock of such obstruction.

"Fourth: The lessor agrees to clear the dock of said obstruction, or to remove the same, as soon as practicable, and to commence the work of removal or clearance not later than the first day of April, A. D., 1929, and to continue said work until the said old hull is removed or so disposed of as to give at least six (6) feet of water in the slip at mean low tide."

It is admitted that the oil company paid the sum of $500.00 for the removal of the old sunken boat; that the old boat was removed; that the water in the slip was never six feet deep at mean low tide. It is also admitted that the oil company paid the stipulated monthly rental for some four years, and it is alleged and proven that the oil company made frequent demands or requests that it be furnished a six-foot depth of water in the south slip from which the old sunken boat had been removed.

The prevailing depression cut down the revenue of the oil company, and a request was made by it for a reduction of the rent. This request, which was refused, was not based upon the failure to have the six feet of water in the slip. In

that part of the correspondence relative to the reduction of rent, the depth of the water was not mentioned. However, later when the monthly payments of rent ceased, the oil company did claim that the contract had never been carried out, in that the depth of the water in the slip was not maintained at six feet and that the slip was thereby rendered useless. It is quite apparent that the oil company had considered this slip of considerable value and importance; otherwise it would not have contributed $500.00 for the removal of the old sunken boat.

The legal questions involved in this case center around the two propositions of eviction and estoppel. The oil company claims that the conduct of its landlord in depriving it of the use of a material portion of the leased premises amounted to a total eviction from a portion of the premises, the law governing which will be referred to hereinafter. The utilities commission claims that the oil company has paid the monthly rental regularly for some four years, knowing that the depth of the water in the slip was never six feet, and, the payments not being made under protest, the right to demand a six-foot depth in the slip was waived and also that the oil company was estopped from now making the claim. To these questions our attention will now be directed.

As to eviction, the precise question, according to the statement of counsel, has never been passed upon in this State and our independent investigation of the cases discloses only the following very brief statement: "Eviction suspended the rent." *Maverick v. Lewis,* 3 McCord, 211, citing 1 Selwyn's N. P., 539. This case, however, applied to a total eviction from all the premises, and the law as to a total eviction from a portion of the leased premises remains an open one in this state.

According to the contention of the defendant oil company, it has been actually evicted from that portion of the leased premises south of the south wharf by reason of the fact that the water depth was never maintained at six feet and

that the one hundred feet of water were thereby rendered useless. It further contends that, as the beneficial use of that portion of the leased premises was completely destroyed, there was a total eviction from that portion of the premises. The further claim is made that, if the eviction from a material part of the leased premises be made to appear, then the rent for the whole is suspended. If, therefore, no rent be due, no writ of ejectment should issue. Of course it goes without saying that the writ of ejectment could not legally issue unless some amount was due as rent for the premises. The contention of the oil company is based largely upon that line of cases cited in a note to the case of *Toy v. Olinger* (Wis.), 20 A. L. R., 1369. Cases from some sixteen states and from England are cited to sustain this statement of the law.

"Where the acts or conduct of the landlord are such as to deprive the lessee of the beneficial enjoyment and use of some portion of the leased premises, he may retain possession of the remainder of the premises, and use and enjoy the same, without rendering himself liable for any part of the rental; since an actual eviction from a portion of the premises suspends the rent as to the whole."

At page 1370 of the same volume (20 A. L. R.), the statement of the law hereinbelow set forth is sustained by citations from some dozen states: "The great weight of authority is to the effect that, in order for the lessee to rely upon constructive eviction as a ground for avoiding payment of the rent contracted for, he must surrender or abandon the leased premises."

If the conduct of the landlord in the present case amounted to an eviction, it was more constructive than actual, and the doctrine above set forth as applicable to a constructive eviction should apply. Under it the oil company as tenant had a perfect right to abandon the premises and relieve itself from further performance of the rental contract. An

abandonment of the premises, however, appears to have been absolutely necessary.

But was there an eviction of the tenant from any portion of the premises of which the tenant oil company had taken possession? As shown in the note in 20 A. L. R., *supra,* the English doctrine, followed by cases form many of the states, is as follows: "The word 'eviction' was formerly used to denote an expulsion by the assertion of a paramount title, or by process of law. But that sort of an eviction is not necessary to constitute a suspension of the rent, because it is now well settled that, if the tenant loses the benefit of the enjoyment of any portion of the demised premises, by the act of the landlord, the rent is thereby suspended."

The rule in this state has never been expressed in quite so positive a manner, although it has been held that there can be no eviction by the landlord unless the tenant shall have taken actual possession of the premises from which it is claimed he has been evicted. Such is the holding in *Simon v. Kirkpatrick,* 141 S. C., 251, 139 S. E., 614, 54 A. L. R., 1348, and the authorities therein cited. If the rule in this State is to be followed in the present case, and we see no reason to depart from it, the oil company was never in possession of six feet of water in the south slip, and hence could not be evicted from that which it never possessed.

From what has been said, we do not mean to imply that the oil company is without any remedy for breach of contract or otherwise, as such questions are not now before us for determination.

Another point which arises in this case and which is worthy of serious consideration is founded upon the following facts: The oil company was in possession of the premises for a considerable length of time before the rental contract was executed, and in the rental contract the provision was inserted as to the depth of the water. Even if it be construed that the landlord was bound by the

contract to furnish a depth of six feet at the south slip, this was in the nature of a promised improvement, and upon the failure to perform on the part of the landlord the tenant would not have the right either to refuse the payment of rent or to vacate the premises. In 16 R. C. L., 691, it is said: "Where the landlord agrees to keep the demised premises in repair, in case of his failure to do so the remedy of the tenant is ordinarily either an action for damages for the breach of the agreement, or the making of the repairs by himself and the recovery of the expenses from the landlord, or the withholding of the amount from the rent, and the tenant cannot, as a general rule, treat such failure on the part of the landlord as a constructive eviction, justifying him in abandoning the possession."

There is respectable authority for the doctrine that the duty on the part of the landlord to improve or repair is independent of the obligation of the tenant to pay the rent. 16 R. C. L., 705, and note to *Stevens & Co. v. Pratt,* 119 Wash., 232, 205 P., 10, 28 A. L. R., 1445. And in the case of *Rowland & Sons, Inc., v. Bock,* 150 S. C., 490, 148 S. E., 549, 550, it is said: "The complaint sets out fully the agreement on the part of the landlord to make the alterations detailed, and alleges a breach of said contract by the landlord. The remedy for such breach would be a claim for damages against the landlord, and would give the tenants no right to vacate the premises on account thereof."

Consequently, under no view of the case can we see how the oil company could expect to hold the property covered by the lease free of all demands for payment of rent.

The rent contract was executed January 25, 1929, and this proceeding was brought December 11, 1932. The contract expired September 30, 1933. The contract had expired long before this appeal was argued. Hence the judgment of this Court applies only to the decree of the Circuit Courts as of the time it was signed. We are not advised as to the present relations existing between the parties. Since

the rental contract has long since expired, it would be useless to hold that the tenant should now be ejected for nonpayment of rent. The decision to affirm the decree of the Circuit Judge upon the grounds above stated renders unnecessary the consideration of the other question involved in this appeal, that of estoppel on the part of the oil company to dispute the validity of the claim for rent.

The decree of the Circuit Court is affirmed.

MR. CHIEF JUSTICE BLEASE and MESSRS. JUSTICES STABLER, CARTER and BONHAM concur.